UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:20-CV-00177-GNS

DAPHNE LOGSDON                                                                                          PLAINTIFF

v.

KILOLO KIJAKAZI, ACTING COMMISSIONER[1]
SOCIAL SECURITY ADMINISTRATION                                                            DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court from the Complaint (DN 1) of Plaintiff Daphne Logsdon ("Logsdon") seeking judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  By Order entered April 27, 2021 (Scheduling Order ¶ 5, DN 22), the parties were notified that oral arguments would not be held unless a written request therefor was filed and granted.  No such request was filed.

For the reasons outlined below, the final decision of the Commissioner is **AFFIRMED**, and judgment is **GRANTED** for the Commissioner.

### I.     STATEMENT OF FACTS

This action arises from the denial of the protective applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security filed by Logsdon.  (Administrative R. 17, 328-29, 331-37, DN 20 [hereinafter R.]).  Logsdon protectively filed her Title II application on August 9, 2018, and her Title XVI application on November 6, 2018.  (R. 17, 328-29, 331-37).

---

[1] Kilolo Kijakazi ("Kijakazi") became the Acting Commissioner of Social Security ("Commissioner") on July 9, 2021.  Pursuant to Fed. R. Civ. P. 25(d), Kijakazi is substituted as Defendant in this suit.   See 42 U.S.C. § 405(g).

In both applications, Logsdon alleges that her disability began on April 20, 2015, as a result of a traumatic brain injury, which produced seizures, anxiety and depression, memory loss, balance disturbance, and reduced intellect. (R. 17, 209-10, 219, 261, 269).

Logsdon's claims were denied at the initial review stage on October 30, 2018, and upon reconsideration on February 7,[2] 2019. (R. 17, 216-17, 226-27, 261-64, 269-71). Thereafter, on February 12, 2019, Logsdon filed a written request for a hearing before an administrative law judge. (R. 17, 276-77). Administrative Law Judge John R. Price ("ALJ") conducted a video hearing on September 18, 2019. (R. 17, 49). On December 27, 2019, the ALJ rendered a decision that Logsdon was not disabled pursuant to the five-step sequential process established by the Social Security Administration. (R. 17-39).

At the first step, the ALJ found that Logsdon had not engaged in substantial gainful activity since April 20, 2015, the alleged onset date. (R. 19). At the second step, the ALJ determined that Logsdon's symptoms which qualified as severe impairments were: posttraumatic stress disorder ("PTSD"), anxiety; bipolar/depression; cognitive disorder, not otherwise specified; seizure disorder; headaches; history of pelvic and foot fractures with associated arthritis; and obesity. (R. 20). Logsdon was also found to have the following non-severe impairments: hepatitis C; vision difficulties; and history of substance use/abuse. (R. 20). Next, at the third step, the ALJ found that Logsdon did not have any impairment(s) or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1. (R. 20-23).

---

[2] The ALJ's determination lists the date of Plaintiff's reconsideration denial as February 7, 2019. (R. 17). The Disability Determination and Transmittal document, as well as the date accompanying the signature of the Disability Adjudicator/Examiner, both list the denial date as February 6, 2019. (R. 226, 227). The Court notes, however, that the Notice of Reconsideration document sent to Plaintiff is dated February 7, 2019. (R. 269). As such, the Court will use the February 7.

At the fourth step, the ALJ found that Logsdon has the residual functional capacity ("RFC") to perform light work, with the following limitations: Logsdon can lift 10 pounds frequently and 20 pounds occasionally; standing and walking no more than four-hours and sitting for four-hours in an eight-hour workday with an option to sit and stand every 30 minutes (taking a minute or two to change positions); no climbing ladders, ropes, or scaffolds; occasionally climb ramps and stairs; no work around concentrated vibration and no work around hazards such as unprotected heights and dangerous moving machinery; can work in a low stress setting (defined as a setting with no fast-paced production-rate demands); capable of simple, routine tasks where there is little-to-no change in the work routine and little-to-no independent judgment is required; and she can have no more than occasional interaction with the public, coworkers, or supervisors. (R. 23-24). The ALJ subsequently found that Logsdon is unable to perform any past relevant work. (R. 37).

For the fifth and final step, the ALJ considered Logsdon's age, education, work experience, and RFC to find that Logsdon is capable of performing a significant number of jobs that exist in the national economy. (R. 37-38). Therefore, the ALJ concluded that Logsdon has not been under a disability, as defined by the Social Security Act, from April 20, 2015, through the date of the ALJ's decision. (R. 39).

After an unsuccessful appeal of the adverse determinations to the Appeals Council, Logsdon filed the present action. (R. 1-3; Compl., DN 1). Logsdon filed her Fact and Law Summary and memorandum in support on October 21, 2021. (Pl.'s Fact/Law Summ., DN 27; Pl.'s Mem. Supp., DN 27-1 [hereinafter Pl.'s Mem.]). The Commissioner responded on February 22, 2022. (Def.'s Fact/Law Summ., DN 32).

II. **JURISDICTION**

The Court has jurisdiction to examine the record that was before the Commissioner on the

date of the Commissioner's final decision and to enter a judgment affirming, modifying, or reversing that decision. *See* 42 U.S.C. § 405(g).

### III. STANDARD OF REVIEW

Social security cases may receive different levels of review in federal district courts, depending on the procedural history. The standard applied to the Commissioner's decision upon review is to determine "whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 42 U.S.C. § 405(g); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

"Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way." *Cotton v. Sullivan*, 2 F.3d 692, 695 (6th Cir. 1993) (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993)). It is "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citation omitted). In reviewing a case for substantial evidence, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citation omitted)). Where substantial evidence supports the ALJ's decision, a court is obliged to affirm. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

### IV. DISCUSSION

In her Fact and Law Summary, Logsdon challenges the sufficiency of the ALJ's analysis regarding the medical opinion evidence and asserts that the ALJ "failed to create a logical bridge between the evidence and the RFC" finding. (Pl.'s Mem. 11). This gap allegedly results from the ALJ finding that all of the medical opinion evidence was, at least partially, unpersuasive. (Pl.'s Mem. 13 (citing R. 35-37)). Logsdon contends that the ALJ "engaged in impermissible

4

cherry-picking of the evidence" by purportedly "paint[ing] an incomplete picture of Plaintiff" and her impairments. (Pl.'s Mem. 14-15). Moreover, Logsdon asserts that the ALJ willfully ignored evidence which supports the opinions of Logsdon's providers. (Pl.'s Mem. 16). According to Logsdon, "[t]he record as a whole supports a finding that Plaintiff is incapable of tolerating interaction with co-workers, supervisors, and the public[,]" and the ALJ had insufficiently explained how he concluded that Logsdon was capable of such interactions. (Pl.'s Mem. 17-18). Finally, Logsdon claims that any errors committed by the ALJ were harmful, as the limitations opined by her providers would have precluded Logsdon's ability to work under Social Security Rulings 85-15 and 96-8p. (Pl.'s Mem. 18).

As Logsdon filed her applications after March 27, 2017, the new regulations for evaluating medical opinions are applicable. *See* 20 C.F.R. §§ 404.1520c, 416.920c. Specifically, the new regulations indicate that no specific evidentiary weight will be given to medical opinions in the record. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, administrative law judges will now evaluate the "persuasiveness" of medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c(a), (b); 20 C.F.R. § 416.920c(a), (b). In evaluating the persuasiveness, the administrative law judges will utilize the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation, namely: supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). Of these five factors, the two most important are supportability and consistency. 20 C.F.R. § 404.1520c(a), (b)(2); 20 C.F.R. § 416.920c(a), (b)(2). The regulations further require administrative law judges to explain how they considered the supportability and consistency factors in determining the persuasiveness of the medical source's opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Under the regulations, administrative law judges "may, but are not required to, explain" how they considered

5

the three other factors in determining the persuasiveness of the medical source's opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The ALJ found the State agency physicians' opinions to be persuasive as it pertains to a light exertional level of work, but the ALJ incorporated greater limitations in some aspects "to better account for the combination of [] [Logsdon]'s severe impairments[,]" as the ALJ noted that he "had the opportunity to consider additional medical evidence of record . . . ." (R. 35). The State agency reviewing psychologist's opinion was found to be unpersuasive, as the psychologist opined that there was insufficient evidence for a reliable determination regarding mental impairments. (R. 35). Dr. Greg Lynch, Ph.D. ("Dr. Lynch"), a consultative psychological examiner, conducted examinations in 2015 and 2019, and the ALJ found his opinion unpersuasive, regarding limitations which were not felt to be well supported by or consistent with Logsdon's overall mental health. (R. 36). Jessica Young, LCSW ("Young"), Logsdon's treatment provider, crafted an opinion which the ALJ found unpersuasive because the opinion was not well supported by the record. (R. 36). Finally, the 2015 recommendation of appointment of a guardianship made by Logsdon's treating specialist, Dr. Sarah Wagers, M.D. ("Dr. Wagers"), was found to be unpersuasive, "as it appears on its face temporary in nature[,]" and a subsequent traumatic brain injury questionnaire was also found to be unpersuasive as "[t]he extent of the opined limitations do[] not appear well supported by actual clinical findings or overall conservative care . . . ." (R. 37). Moreover, the ALJ noted that the limitations from the questionnaire did not appear "consistent with mental status findings during psychiatric treatment follow-up . . . ." (R. 37).

At step three of the sequential analysis, the ALJ discussed Listings 12.02, 12.04, 12.06, and 12.15, including paragraph B criteria and, more specifically, the criterion of "interacting with

6

others." (R. 21-22). The ALJ discussed Dr. Lynch's 2015 consultative examination, where Logsdon noted that she lived with her mother, spoke with her boyfriend by telephone daily, maintained normal eye contact, was adequately cooperative, and reported adequate social support though Logsdon states that she tends to isolate herself from others. (R. 22 (citing R. 701-09)). Turning to the 2019 examination, the ALJ referenced Logsdon's reports of "adequate" social support and isolation, as well as her "adequate" cooperation during the exam. (R. 22 (citing 1207-15)). Finally, the ALJ mentioned Logsdon's testimony from the administrative hearing reporting that she spends time with her mother and the two periodically go shopping together. (R. 22).

The ALJ's opinion also discusses how Logsdon had returned to work at a doughnut store and at McDonald's but both jobs ended due to memory issues. (R. 25). In the following paragraph, the ALJ noted that prior to her accident, Logsdon had previously lived with her mother, then with a boyfriend, and now lives alone. (R. 25). Logsdon reported that she goes shopping with her mother for groceries. (R. 25). After discussing physical impairments, the ALJ considered Logsdon's mental impairments. (R. 30-34). The ALJ extensively references Dr. Lynch's 2015 examination, including Logsdon's reports of frequently seeing family members, less frequent visits with friends, and daily conversations with her boyfriend. (R. 30 (citing R. 701-09)). A 2016 document from her neuro-specialist reported Logsdon's subjective complaints of emotional difficulties, such as impulsiveness with inability to tolerate things or people. (R. 31 (citing R. 825)). Thereafter, in 2018, Logsdon returned to outpatient mental health treatment, where she was cooperative during the session. (R. 32 (citing R. 838-40)).

Analyzing the medical opinions, the ALJ began with Dr. Lynch. (R. 36). In 2015, Dr. Lynch opined "moderate to marked" limitations in Logsdon's capacity to respond appropriately to supervision, coworkers, and work pressures. (R. 36) (citing R. 709). After a 2019 examination,

7

Dr. Lynch repeated his opinion of "moderate to marked" limitations. (R. 36 (citing R. 1214)). In a medical source statement, Dr. Lynch found mild limitations in Logsdon's ability to interact appropriately with the public, moderate limitations in her ability to interact appropriately with supervisors, and marked limitations in her ability to interact appropriately with coworkers. (R. 36 (citing R. 1213-15)). Dr. Lynch's opinion was unpersuasive as there were "more recently established psychiatric medication management" as well as Logsdon's reports that medication and therapy were both helpful. (R. 36 (citing R. 1178)).

Next, the ALJ considered the two-page opinion of Young, which consisted of a series of statements mirroring the "paragraph B" criteria in Appendix 1. (R. 36 (citing R. 1173-74)). Young marked a corresponding line indicating Logsdon was "not significantly limited", "moderately limited", "markedly limited", or "severely limited" in each of those areas. (R. 1173-74). When discussing social interaction, Young marked "severely limited" for Logsdon's ability to interact with the general public, ability to accept instruction and respond appropriately to criticism from supervisors, ability to get along with coworkers, and ability to maintain socially acceptable behavior. (R. 1174). Notably, the "markedly limited" line was also selected describing Logsdon's ability to accept instruction and respond appropriately to criticism from supervisors. (R. 1174). The ALJ found this opinion to be unpersuasive as it appeared to be unsupported by the record as a whole. (R. 36). The ALJ commented that treatment records show Logsdon returning to work and enjoying it, as well as helping a friend paint. (R. 36 (citing R. 809)). The ALJ then referenced previous portions of his opinion supporting his finding that Young's opinion was unpersuasive. (R. 36).

Finally, the ALJ addressed the opinions of Dr. Wagers, Logsdon's treating specialist. (R. 37). The first document completed by Dr. Wagers is a 2015 recommendation for a guardianship

for a six-to-twelve-month period, related to Logsdon's traumatic brain injury. (R. 790-92). In the recommendation, Dr. Wagers stated that Logsdon was living with her mother and was to begin volunteer work. (R. 791). The second document from Dr. Wagers was a 2019 "Evaluation of Residuals of Traumatic Brain Injury" which described "[s]ocial interaction [as] inappropriate most or all of the time[]" stemming from Logsdon "[f]requently ha[ving] negative and confrontational interactions with family, friends and strangers[.]" (R. 921-25). Moreover, Dr. Wagers recounted reports of daily struggles of irritability, impulsivity, verbal aggression, and a difficulty or inability to communicate complex issues. (R. 925). The ALJ found the first document unpersuasive as it was "temporary in nature" and then addressed Logsdon's self-report of methamphetamine use until April 2018. (R. 37). The evaluation was considered unpersuasive as the ALJ viewed it as not well supported by clinical findings or consistent with the "overall conservative care by this treatment provider . . . ." (R. 37). The ALJ also referenced previous discussions in his determination and remarked that Logsdon reported her enjoyment of her part-time job. (R. 37 citing R. 809)).

Logsdon asserts that the ALJ impermissibly found the opinions of Drs. Lynch and Wagers, as well as Young, to be unpersuasive, even after failing to consider records which indicted that Logsdon had engaged in a physical altercation with a man and reported enjoyment from fighting with men who attempt to harm her; was "very difficult" to live with; exhibited erratic, loud, and animated behavior; threatened to kill her boyfriend's heroin dealers' children and burn them; attempted to return to work at McDonald's but had difficulty learning how to use the cash register; had difficulty driving; destroyed property, which led to involvement of the courts; and Logsdon's repeated references to burning items and people. (Pl.'s Mem. 15-17 (citing R. 817, 926, 1186, 1190, 1193-94, 1197, 1199)).

9

Reviewing the ALJ's determination, it is clear that all of the pages cited by Logsdon were, in fact, referenced by the ALJ. Specifically, the ALJ cited R. 817 individually and when addressing section 10F of the administrative record generally, R. 926 individually and when addressing section 16F generally, and other psychotherapy treatment notes individually and documents cited by Logsdon when generally addressing section 20F. (R. 27-37). Throughout the determination, the ALJ repeatedly discussed Logsdon's interpersonal relationships, her communications with friends and family, her social support system despite self-isolation, her interactions with her providers, the reports about the effects of medication and therapy, and her attempts to return to employment. (R. 24-37).

In these discussions, the ALJ directly considered the supportability and consistency aspects of the five factors of 20 C.F.R. §§ 404.1520c(c) and 416.920c(c). While the ALJ may not have directly used these terms, he clearly noted why the medical opinions of Drs. Lynch and Wagers and Young were not supported or consistent with the longitudinal history of Logsdon's records or the "overall conservative care" by Dr. Wagers and cited the documentation to the contrary. As discussed above, supportability and consistency are the two most important of the five factors, and the ALJ is not required to explicitly mention how they weighed the three remaining factors. 20 C.F.R. § 404.1520c(a), (b)(2); 20 C.F.R. § 416.920c(a), (b)(2). Thus, the ALJ has complied with the necessary regulations, regardless of whether those factors were quoted verbatim.

Even though Logsdon reported thoughts of extreme action if her boyfriend had overdosed on heroin (*see* R. 1193-94), the documents detailing those reports were considered as part of the ALJ's RFC determination. Considering these reports, the medical opinions (even the unpersuasive ones), and the other medical documentation, the ALJ took all this information into

account and crafted an RFC which limited Logsdon to "no more than occasional interaction with the public, coworkers, or supervisors." (R. 24).

As for Logsdon's claims that the ALJ "engaged in impermissible cherry-picking of the evidence," "[g]enerally, an ALJ has a duty not to cherry-pick facts from the record to support a finding of not disabled where a finding of disabled would otherwise be appropriate." (Pl.'s Mem. 14-15); *Coppage v. Berryhill*, No. 1:16-CV-00144-GNS, 2017 U.S. Dist. LEXIS 214523, at *10 (W.D. Ky. Aug. 10, 2017) (citing *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 U.S. Dist. LEXIS 40098, at *16-17 (N.D. Ohio Mar. 11, 2013)), *adopted by* 2018 U.S. Dist. LEXIS 2212 (W.D. Ky. Jan 5, 2018). "However, an ALJ does not cherry-pick the record simply by resolving discrepancies in the record against the claimant." *Id.* As in *Coppage*, "[w]hat some describe as 'cherry-picking' may more neutrally be termed weighing the evidence." *Id.* (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)). Here, the ALJ's findings and analysis throughout the opinion demonstrate a reliance on the complete record and not the result of "cherry-picked" evidence.

Certainly, the ALJ "must provide an accurate and logical bridge between the evidence and the conclusion[,]" but the ALJ is not required to explicitly mention or discuss every piece of evidence in the record. (Pl.'s Mem. 17 (quoting *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346, at *8 (E.D. Tenn. July 19, 2010))); *Miller v. Saul*, No. 1:19-CV-00111-HBB, 2020 U.S. Dist. LEXIS 71227, at *17 (W.D. Ky. Apr. 23, 2020) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)). Review of the record and the ALJ's determination, however, demonstrates support of the RFC findings by substantial evidence and a logical bridge between the evidence and the RFC. The ALJ considered the medical opinions of Drs. Lynch and Wagers, as well as Young's opinion, and the ALJ clearly articulated reasons for

11

finding the opinions, supported by citations to the record. While Logsdon may have wanted the ALJ to structure his analysis differently, consider the medical opinions more or less persuasive than opined, or to find more restricted limitations in interactions with others, these reasons do not justify usurping the role and findings of the ALJ.

For these reasons, the ALJ's RFC determination is supported by substantial evidence and complies with the applicable law.

In her Fact and Law Summary, the Commissioner discusses Listings 12.04, 12.06, and 12.15, as well as the ALJ's step three analysis. (Def.'s Fact/Law Summ. 17-18). This discussion stems from the inclusion of a singular line in Logsdon's memorandum: "Furthermore, the opinions of LCSW Young, Dr. Wagers and Dr. Lynch support a finding that Plaintiff meets or equals Listings 12.04, 12.06 and or 12.15." (Pl.'s Mem. 18). As the Commissioner points out, however, this is the extent of Logsdon's argument on this point. It is well-established that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . ." *United States v. Layne*, 192 F.3d 556, 566 (6th Cir.1999) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)); *see also Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) (observing that "[w]e consider issues not fully developed and argued to be waived."); *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 453 (6th Cir. 2006). Therefore, Logsdon's perfunctory contentions regarding the step-three analysis have been waived.

## V.     CONCLUSION

As noted previously, where substantial evidence supports the ALJ's decision, a court is obliged to affirm. *See Siterlet*, 823 F.2d at 920. Regardless of other ways in which the evidence could be viewed, it is not this Court's place to re-try or re-evaluate the findings of the ALJ. 42 U.S.C. § 405(g). Rather, this Court is only to find if substantial evidence exists to support the

ALJ's decision and if the ALJ followed the applicable law.  *Id.*   As discussed above, the ALJ's findings are supported by substantial evidence.

For the foregoing reasons, **IT IS HEREBY ORDERED** that the final decision of the Commissioner is **AFFIRMED**, and judgment is **GRANTED** for the Commissioner.

Greg N. Stivers, Chief Judge
United States District Court

March 16, 2022

cc: counsel of record